UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------- X

H.R., by his parent and natural guardian,
MARVA RICHARDS,

                        Plaintiff,

           -against-

THE CITY OF NEW YORK; P.O. GREEN; and
P.O. JOHN DOE # 1; the individual
defendant(s) sued individually and in
their official capacities,

                     Defendants.

---------------------------------------- X

**FIRST AMENDED**
**COMPLAINT**

11-cv-06338-KAM-MDG

ECF Case

Jury Trial Demanded

## **PRELIMINARY STATEMENT**

      1.   This is a civil rights action in which plaintiff seeks relief for the violation of plaintiff's rights secured by 42 U.S.C. § 1983; and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and the laws of the State of New York. Plaintiff's claims arise from an incident that arose on or about September 29, 2010. During the incident, the City of New York, and members of the New York City Police Department ("NYPD") subjected plaintiff to, among other things, excessive force, assault and battery, unlawful search and seizure, false arrest, retaliation for free speech, fabricated evidence, malicious prosecution, denial of a fair trial, gross negligence, intentional and negligent infliction of

emotional distress, negligent hiring and retention, supervision, training and instruction of incompetent and unfit employees, and implementation and continuation of an unlawful municipal policy, practice, and custom.  Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of costs and attorney's fees, pursuant 42 U.S.C. §§ 1988, and such other and further relief as the Court deems just and proper.

## JURISDICTION & VENUE

2.    This action is brought pursuant to 42 U.S.C. § 1983, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by the aforesaid statutes and 28 U.S.C. §§ 1331 and 1343.

3.    Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under state law.  Plaintiff's notice of claim was duly filed on defendant City of New York within 90 days of the incident at issue, more than 30 days have elapsed since such filing and the City of New York has refused to settle plaintiff's claims.  Moreover, this action has been filed within one year and 90 days of the incidents that are the basis of this claim.  On February 21, 2012, plaintiff participated in a 50-H

hearing.  Plaintiff has satisfied all conditions precedent for the filing of this action.

4.    Venue is proper here pursuant to 28 U.S.C. § 1391 because some of the acts in question occurred in Kings County, and the City of New York is subject to personal jurisdiction in the Eastern District of New York.

## PARTIES

5.    Plaintiff H.R., by his natural parent and guardian Marva Richards, is a 17 year old African American (who was 16 years old on the date of the incident), and resident of the State of New York, Kings County.

6.    At all times alleged herein, defendant City of New York was a municipal corporation organized under the laws of the State of New York, which violated plaintiff's rights as described herein.

7.    At all times alleged herein, defendant P.O. Green was a New York City Police Officer employed with the Broad Junction Precinct, Transit District 33, located in Kings County, New York or other as yet unknown NYPD assignment, who violated plaintiff's rights as described herein.

8.    At all times alleged herein, defendant P.O. John Doe # 1 was a New York City Police Officer employed with the Broad Junction Precinct, Transit District 33, located in Kings

County, New York or other as yet unknown NYPD assignment, who violated plaintiff's rights as described herein.

9.    The individual defendants are sued in their individual and official capacities.

## STATEMENT OF FACTS

10.    On September 29, 2010, at and in the vicinity of Bedford Avenue Subway Station (L Line), Brooklyn, New York, and the Broad Junction Precinct, Transit District 33, Brooklyn, New York, several police officers operating from the Broad Junction Precinct, Transit District 33, including upon information and belief, defendants P.O. Green and P.O. John Doe # 1, at times acting in concert, and at times acting independently, committed the following illegal acts against plaintiff.

11.    On September 29, 2010, at approximately 2:30 p.m., at and in the vicinity of the Bedford Avenue Subway Station (L Line), Brooklyn, New York, defendants P.O. Green and P.O. John Doe # 1, without either consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff (or any third person) had committed a crime unlawfully arrested the plaintiff.

12.    Plaintiff was with his friends waiting on the subway platform.

13.    An eastbound subway arrived at the platform.

4

14.   P.O. Green and P.O. John Doe # 1 approached the plaintiff and his friends and told them to board the train.

15.   The plaintiff told P.O. Green and P.O. John Doe # 1 that he was not headed in that direction.

16.   However, P.O. Green and P.O. John Doe # 1 insisted that he still board the train.

17.   The plaintiff again informed P.O. Green and P.O. John Doe # 1 that he was not headed in that direction and that it was not his train.

18.   The defendant officers responded by stating in word and effect: That's it you're going down!

19.   The plaintiff was not free to walk away or leave the scene.

20.   The defendant officers grabbed, pulled and shoved the plaintiff, taking him off the platform and onto a flight of stairs.

21.   The plaintiff complained that he had not done anything wrong, to which the defendant officers replied again in words in effect: You're going down!

22.   The defendant officers threw the plaintiff onto the ground and placed him in an arm bar.

23.   The defendant officers placed a knee in the plaintiff's back.

24.    The defendant officers twisted the plaintiff's arms and placed excessively tight handcuffs on his wrists.

25.    The defendant officers did not have an objective and/or reasonable basis to use any degree of force against the plaintiff, since plaintiff had committed no crime, was unarmed, compliant, and did not resist arrest.

26.    These acts of force against plaintiff were malicious, gratuitous, unnecessary, and without unlawful authority or cause.  Those defendants who did not touch the plaintiff, witnessed these acts, but failed to intervene and protect plaintiff from this conduct.

27.    The plaintiff was physically injured as a result of this use of force, and those injuries included pain and marks to his body.

28.    After the plaintiff was handcuffed, the defendant officers joked and made the plaintiff's friends board a train.

29.    The defendant officers then took the plaintiff from the subway station and harassed him by asking whether he disliked police officers, and why he had given them trouble.

30.    The defendant officers then searched the plaintiff's person and backpack without justification, and found no controlled substances, weapons, or contraband.

31.   Instead, the defendant officers found, among other things, the plaintiff's SAT preparation course workbook.

32.   The defendant officers radioed for a patrol car and they waited, in public, for approximately 30 minutes to be transported.

33.   The defendant officers drove with the plaintiff for approximately 30 minutes, before arriving at the Broad Junction Precinct, Transit District 33, Brooklyn, New York, for arrest processing.

34.   At the front desk, a supervising police officer asked the defendant officers why they had arrested the plaintiff, to which the defendant officers replied, in words and effect that they did not know.

35.   The supervising police officer stated in words and effect that the defendant officers could not bring an arrestee into the precinct if they did not know why.

36.   The defendant officers then took the plaintiff inside the precinct and searched him again, and found no controlled substances, weapons, or contraband.

37.   The defendant officers then locked the plaintiff in a cell with another individual who upon information and belief was an adult.

38.    The defendant officers ran a warrant check on the plaintiff and found no warrants concerning him.

39.    The defendant officers were visibly angered by this outcome.

40.    The defendant officers eventually issued the plaintiff a desk appearance ticket and released him from the precinct.

41.    In order to cover up their illegal actions, the defendant officers, pursuant to a conspiracy, falsely and maliciously told the Kings County District Attorney's Office that the plaintiff had committed various crimes.

42.    The defendants made these false allegations, despite the fact that they had no evidence that plaintiff had committed a crime.

43.    The charges against the plaintiff were dismissed at arraignment on December 7, 2010, and the case against him terminated in his favor.

44.    The individual defendants acted in concert in committing the above-described illegal acts against the plaintiff.

45.    The plaintiff did not resist arrest at any time during the above-described incidents.

46. The plaintiff did not violate any law, regulation, or administrative code; commit any criminal act; or act in a suspicious or unlawful manner prior to or during the above-described incident.

47. The individual defendants did not observe the plaintiff violate any law, regulation, or administrative code; commit any criminal act; or act in a suspicious or unlawful manner prior to or during the above-described incident.

48. The individual defendants acted under pretense and color of state law and their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority or law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of their rights.

49. Defendant City of New York through the NYPD and its officers, committed the following unconstitutional practices against the plaintiff: (1) fabricating evidence against innocent persons; (2) unlawfully stopping and searching persons; (3) wrongfully arresting individuals based on pretexts and profiling; (4) using excessive force on individuals; and (5) arresting innocent persons in order to meet productivity goals.

50.   The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct involving the individual defendants, placing the defendant City of New York on notice of the individual defendants' propensity to violate the rights of individuals.

51.   Additionally, the existence of the aforesaid unconstitutional customs and polices of profiling minorities, may be inferred from an analysis of the NYPD conducted by the New York Civil Liberties Union ("NYCLU").  The NYCLU's analysis revealed that more than 2 million innocent New Yorkers were subjected to police stops and street interrogations from 2004 through 2010, and that black and Latino communities continue to be the overwhelming target of these tactics.  Nearly nine out of 10 stopped-and-frisked New Yorkers have been completely innocent, according to the NYPD's own reports:

52.   In 2004, 315,483 New Yorkers were stopped by the police: 279,754 were totally innocent (89 percent); 156,056 were black (50 percent); 90,468 were Latino (29 percent); and 29,000 were white (9 percent).

53.   In 2005, 399,043 New Yorkers were stopped by the police: 351,842 were totally innocent (88 percent); 196,977 were

black (49 percent); 115,395 were Latino (29 percent); and 40,837 were white (10 percent).

54.   In 2006, 508,540 New Yorkers were stopped by the police: 458,104 were totally innocent (90 percent); 268,610 were black (53 percent); 148,364 were Latino (29 percent); and 53,793 were white (11 percent).

55.   In 2007, 468,732 New Yorkers were stopped by the police: 407,923 were totally innocent (87 percent); 242,373 were black (52 percent); 142,903 were Latino (31 percent); and 52,715 were white (11 percent).

56.   In 2008, 531,159 New Yorkers were stopped by the police: 465,413 were totally innocent (88 percent); 271,602 were black (51 percent); 167,111 were Latino (32 percent); and 57,407 were white (11 percent).

57.   In 2009, 575,304 New Yorkers were stopped by the police: 504,594 were totally innocent (88 percent); 308,941 were black (54 percent); 179,576 were Latino (31 percent); and 53,466 were white (9 percent).

58.   In 2010, 601,055 New Yorkers were stopped by the police: 517,458 were totally innocent (86 percent); 317,642 were black (53 percent); 190,491 were Latino (32 percent); and 55,083 were white (9 percent).

59.    In addition, research by Harry G. Levine, a professor of sociology at Queens College, City University of New York (who is the coauthor of Crack in America: Demon Drugs and Social Justice, and of the NYCLU report: Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City, 1997-2007) also shows City of New York's unconstitutional customs and polices against minorities.

60.    In August 2009, Proffer Levine released a report entitled *The Epidemic of Pot Arrests in New York City*, which stated: Perhaps most appalling is who the police are arresting for marijuana possession.  United States government studies have consistently found that young whites use marijuana at higher rates than do young blacks or Latinos. But the NYPD has long arrested young blacks and Latinos for pot possession at much higher rates than whites. In 2008, blacks were about 26% of New York City's population, but over 54% of the people arrested for pot possession. Latinos were about 27% of New Yorkers, but 33% of the pot arrestees. Whites were over 35% of the City's population, but less than 10% of the people arrested for possessing marijuana. In 2008, police arrested Latinos for pot possession at four times the rate of whites, and blacks at seven times the rate of whites.

61.    Furthermore, documented civilian complaints about officer misconduct show that African Americans are the most likely targets of abuse, but their complaints are largely ignored.  According to the City of New York's Civil Complaint Review Board's ("CCRB") Status Report, dated December and January 2010, in 2010 African Americans were overrepresented as alleged victims of police misconduct.  Although making up only 23% of New York City's population, they are 58.5% of the alleged victims in CCRB complaints.  On the other hand, whites and Asians were a disproportionately low percentage of alleged victims.

62.    The report continued: In 2010, 12% of alleged victims were white, and 2% were Asian, though they make up 34% and 13% of New York City's population, respectively.  The percentage of Latino victims was comparable to the population.  Latinos were 25% of alleged victims in CCRB complaints and 29% of the population.  These numbers have remained fairly consistent over the last five years, with between 56% and 58% of all alleged victims being African-American.  Latinos have consistently made up between 23% and 26% of alleged victims, and Whites between 12% and 14%. Asians have never made up less than 2% or more than 3% of all alleged victims. Each year, approximately 3% of alleged victims are classified as "other."

13

63.   However, the vast majority of these complaints are ignored by the City of New York and the NYPD.  According to the NYCLU, the CCRB is failing to fulfill its mission as mandated in the City Charter.  The New York City Charter mandates that the CCRB undertake "complete, thorough and impartial" investigations of police-misconduct complaints brought by civilians, and that these investigations are conducted in a manner in which both the public and the police have confidence.  The CCRB fails to meet this standard.  The agency investigates fewer than half of all complaints that it reviews, and it produces a finding on the merits in only three of ten complaints disposed of in any given year.  The agency has failed to win the confidence of the city's residents; the police department is largely dismissive of CCRB findings and recommendations.

64.   The report continued:  The CCRB has been unable to establish an effective investigative operation.  The CCRB has historically closed about 50 percent of police-misconduct complaints without initiating an investigation; between 2002 and 2005 the "truncation" rate increased to 55 percent.  In 2006 the CCRB closed 60 percent of all complaints without undertaking an investigation.  The CCRB has conducted a full investigation in fewer than half of the complaints it has reviewed and disposed

14

of.  In 2002-2005 the CCRB closed only 42 percent of complaints

with a full investigation.   Of complaints fully investigated by

the CCRB, the agency has disposed of approximately one-third as

unsubstantiated -- or inconclusive.  The CCRB has substantiated,

on average, 5.2 percent of complaints closed -- far below the

substantiation rates reported by civilian oversight agencies

nationally.

        65.   The report further stated: The CCRB has failed to

advocate effectively for reform of police practices that pose a

risk to public safety.  The CCRB has done little to identify

patterns of police misconduct and to recommend reforms in police

practices that pose an undue risk of harm to civilians.  The

CCRB has failed to address effectively patterns of police

misconduct related to racial profiling, the execution of "no-

knock" warrants, and the policing of lawful public

demonstrations.  Even when the CCRB has documented a pattern of

misconduct, and recommended reforms, the agency has often been

silent when the department failed to act on the recommendations.

        66.   Moreover, according to the research done by the

NYCLU, the NYPD condones acts of police misconduct by nullifying

CCRB findings and recommendations.   The department takes no

disciplinary action against almost 30 percent of police officers

named in substantiated CCRB complaints.  Between 2000 and 2005

the NYPD disposed of substantiated complaints against 2,462 police officers: 725 received no discipline. When discipline was imposed, it was little more than a slap on the wrist.  Of the 1,607 police officers who were disciplined in this time period, 534 received instructions regarding the misconduct.  Another 717 police officers received command discipline -- which at the discretion of the precinct commander may involve nothing more than a verbal admonishment. The most severe sanction imposed under command discipline is a loss of 10 vacation days.  In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians.  In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved.

        67.  Finally, of the 1,076 police officers who were referred to an administrative trial to face charges between 1998 and 2004, approximately 63 percent received no discipline. (2004

16

is the last year for which complete data are available on disciplinary action taken by the NYPD, based on the year CCRB complaints were referred for discipline.)  In most of those cases, the administrative trial judge dismissed the charges or found the police officer not guilty.  During this time period, cases were dismissed against 198 police officers against whom the CCRB had substantiated misconduct complaints. In another 363 cases administrative judges issued non-guilty findings.

68.    Indeed, at one federal district court has noticed this persistent pattern of abuse and failure to monitor police misconduct.  In *Colon v. The City of New York,* 09-cv-8, 09-CV-9-JBW, 2009 WL 4263362 (E.D.N.Y. November 25, 2009), the federal court stated that an "[in]formal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the NYPD."

69.    The existence of the aforesaid unconstitutional customs and polices can also be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported in the media on January 20, 2006, that commanders are permitted to set "productivity goals".

17

70.   These productivity quotas drive officers, such as the individual defendants in this case, to behave in an "overzealous" and unlawful manner to satisfy these goals.

71.   As reported in an October 13, 2011 New York Times article, entitled *The Drugs? They Came From the Police*, Steve Anderson, a former undercover police officer, testified at a criminal trial against a former fellow officer that "various narcotics" were kept and used by undercover officers to frame people for phantom drug sales.

72.   In two days on the witness stand at a trial of another officer in State Supreme Court in Brooklyn, Mr. Anderson, who worked in elite units in Brooklyn and Queens, described how rules were trimmed, broken or ignored so that narcotics officers could make their monthly quotas of arrests or buys.

73.   His testimony fundamentally recast a scandal that became public three years ago, when officers in Brooklyn were caught not vouchering all the drugs they seized as evidence.  At the time, the authorities said the officers were using the surplus as rewards for information, with one law enforcement official describing it as "noble cause corruption."

74.   Mr. Anderson, however, testified that those spare drugs had other purposes: to plant on people when a narcotics officer needed a productivity boost.

75.   As a result of investigations into the drug units, prosecutors in Brooklyn and Queens have dismissed about 400 criminal cases that they believe were tainted by the involvement of officers connected to the scandal.

76.   Mr. Anderson testified in the trial of Jason Arbeedy, who worked in Brooklyn and is accused of planting drugs on two people who had never been arrested.  Although he testified that he did not know Mr. Arbeedy or have any knowledge of wrongdoing by him, Mr. Anderson's description of the narcotics units was offered by prosecutors as evidence of what they say is a conspiracy to cover up its lawlessness by routinely falsifying records and keeping stashes of narcotics.

77.   Justice Gustin Reichbach, who heard the case without a jury, said he understood why Mr. Anderson would swap an arrest to help a fellow officer who was falling short of his targets, but pressed him on what he had done to innocent people.

78.   "What was your thought in terms of saving his career at the cost of these four people who had seemingly no involvement in the transaction?" Justice Reichbach asked.

79.   It was called "attaching bodies" to the drugs, Mr. Anderson answered, and he said nearly four years into his life undercover, he had become numb to the corruption.

80.   "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators," Mr. Anderson said. "Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway."

81.   "That kind of came on to me and I accepted it — being around that so long, and being an undercover."

82.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD constituted a deliberate indifference to the safety, well-being and constitutional rights of plaintiff.

83.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by the plaintiff as alleged herein.

84.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the moving force behind the constitutional violations suffered by the plaintiff as alleged herein.

85.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD, the plaintiff was unlawfully detained and searched, falsely arrested, subjected to excessive force, retaliation, malicious prosecution, denial of a fair trial, and fabricated evidence.

86.    As a direct and proximate result of the defendants' actions plaintiff experienced personal and physical injuries, pain and suffering, fear, an invasion of privacy, psychological pain, emotional distress, mental anguish, embarrassment, humiliation, and financial loss.

87.    Plaintiff is entitled to receive punitive damages from the individual defendants because the individual defendants' actions were motivated by extreme recklessness and indifference to plaintiff's rights.

## FIRST CLAIM

### (UNLAWFUL SEARCH AND SEIZURE UNDER FEDERAL LAW)

88.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

89.    Defendants unlawfully stopped and searched plaintiff without a warrant, or consent.

90.    Accordingly, defendants are liable to plaintiff for unlawful search and seizure under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## SECOND CLAIM

### (UNLAWFUL SEARCH AND SEIZURE UNDER STATE LAW)

91.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

92.    Defendants unlawfully stopped and searched plaintiff without a warrant, or consent.

93.    Accordingly, defendants are liable to plaintiff for unlawful search and seizure under New York State law.

## THIRD CLAIM

### (FALSE ARREST UNDER FEDERAL LAW)

94.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein

95.    Defendants falsely arrested plaintiff without consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff had committed a crime.

96.    Accordingly, defendants are liable to plaintiff for false arrest under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

22

## FOURTH CLAIM

### (FALSE ARREST UNDER STATE LAW)

97.   Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

98.   Defendants falsely arrested plaintiff without consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff had committed a crime.

99.   Accordingly, defendants are liable to plaintiff for false arrest under New York State law.

## FIFTH CLAIM

### (EXCESSIVE FORCE)

100.   Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

101.   The individual defendants' use of force upon plaintiff, as described herein, and the individual defendants' failure to intervene, was objectively unreasonable.

102.   Accordingly, defendants are liable to plaintiff for using unreasonable and excessive force, pursuant to 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## SIXTH CLAIM

### (ASSAULT)

103.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

104.  Among other things as described above, defendants' search and seizure, battery, false arrest, and excessive use of force against plaintiff placed them in fear of imminent harmful and offensive physical contacts.

105.  Accordingly, defendants are liable to plaintiff under New York State law for assault.

## SEVENTH CLAIM

### (BATTERY)

106.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

107.  Among other things as described above, defendants' search and seizure, false arrest, and excessive use of force against plaintiff were illegal physical contacts.

108.  Accordingly, defendants are liable to plaintiff under New York State law for battery.

## EIGHTH CLAIM

### (RETALIATION)

109.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

110. Plaintiff exercised free speech during the incident by, among other things, complaining about the individual defendants' unlawful acts.

111. Plaintiff's use of free speech was a motivating factor in the individual defendants' decision to falsely arrest them.

112. Accordingly, the individual defendants are liable to plaintiff under the First Amendment to the United States Constitution.

<u>**NINTH CLAIM**</u>

**(MALICIOUS PROSECUTION CLAIM UNDER FEDERAL LAW)**

113. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

114. The individual defendants are liable to plaintiff for malicious prosecution because, pursuant to a conspiracy and acting with malice, the defendants initiated malicious prosecution(s) against plaintiff by knowingly, intentionally, and maliciously providing false statements to prosecutors and/or the court(s), which alleged plaintiff had committed various crimes.

115. The individual defendants lacked probable cause to believe the above-stated malicious prosecution(s) could succeed.

116.    The individual defendants acted to cover up their illegal and unconstitutional conduct by initiating the above-stated malicious prosecution(s).

117.    The above-stated malicious prosecution(s) caused a sufficient post-arraignment liberty restraint on plaintiff.

## TENTH CLAIM

### (MALICIOUS PROSECUTION CLAIM UNDER STATE LAW)

118.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

119.    The individual defendants are liable to plaintiff for malicious prosecution because, pursuant to a conspiracy and acting with malice, the defendants initiated malicious prosecution(s) against plaintiff by knowingly, intentionally, and maliciously providing false statements to prosecutors and/or the court(s), which alleged plaintiff had committed various crimes.

120.    The individual defendants lacked probable cause to believe the above-stated malicious prosecution(s) could succeed.

121.    The individual defendants acted to cover up their illegal and unconstitutional conduct by initiating the above-stated malicious prosecution(s).

## ELEVENTH CLAIM

### (FABRICATED EVIDENCE)

122.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

123.  The defendants are liable to plaintiff because they intentionally conspired to fabricate evidence against the plaintiff, depriving the plaintiff of liberty without due process of law.

124.  In addition, the defendants used and presented the fabricated evidence to prosecute the plaintiff.

125.  Further, the defendants were on notice that creating fabricated evidence is a clear violation of law because it well established that police officer who knowingly use false evidence to obtain a conviction act unconstitutionally.

126.  Furthermore, the defendants violated the law by making false statements of fact in a certification for determination of probable cause and/or a conviction, because they performed a function of a complaining witness.

## TWELFTH CLAIM

### (DENAIL OF A FAIR TRIAL)

127.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

27

128.   The individual defendants are liable to the plaintiff because they intentionally created false information likely to influence a fact finder's or jury's decision and forwarded that information to prosecutors, a grand jury, and/or court, thereby violating plaintiff's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

## THIRTEENTH CLAIM

### (NEGLIGENT SUPERVISION, HIRING, MONITORING TRAINING AND RETENTION OF UNFIT EMPLOYEE)

129.   Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

130.   Defendant City of New York is liable to the plaintiff because the occurrence and injuries sustained by plaintiff, were caused solely by, and as a result of the malicious, reckless, negligent, and/or intentional conduct of defendant City of New York, and the NYPD, its agents, servants and/or employees, as set forth above, without provocation on the part of plaintiff contributing thereto, specifically, the negligent and reckless manner in which said defendant hired, trained, supervised, controlled, managed, maintained, inspected and retained its police officers.

28

## FOURTEENTH CLAIM

### (INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

131.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

132.  That by virtue of the occurrence and defendants, individually and/or by their agents, servants and/or employees, negligently and/or intentionally inflicted emotional harm upon plaintiff.

133.  The defendants' actions against plaintiff were extreme and outrageous and caused plaintiff severe emotional distress.

134.  The defendants breached a duty owed to the plaintiff that either unreasonably endangered plaintiff' physical safety, or caused the plaintiff to fear for their own safety.

## FIFHTEENTH CLAIM

### (NEGLIGENCE AND GROSS NEGLIGENCE)

135.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

136.  Defendants are liable to plaintiff because defendants owed plaintiff a cognizable duty of care as a matter of law, and breached that duty.

## SIXTEENTH CLAIM

**(MONELL CLAIM)**

137.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

138.  Defendant City of New York, through a policy, practice and custom, directly caused the constitutional violations suffered by the plaintiff.

139.  Upon information and belief, defendant City of New York, at all relevant times, was aware that the defendants are unfit officers who have previously committed the acts alleged herein, have a propensity for unconstitutional conduct, or have been inadequately trained.

140.  Nevertheless, defendant City of New York exercised deliberate indifference by failing to take remedial action.  The City failed to properly train, retrain, supervise, discipline, and monitor the individual defendants and improperly retained and utilized them.  Moreover, upon information and belief, defendant City of New York failed to adequately investigate prior complaints filed against the individual defendants.

141.  Further, defendant City of New York was aware prior to the incident that the individual defendants (in continuation of its illegal customs, practices and/or policies) would unlawfully arrest individuals.

30

## SEVENTEENTH CLAIM

### (RESPONDEAT SUPERIOR)

142.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

143.  The individual defendants were acting within the scope of their employment as New York City Police Officers when they committed the above described acts against the plaintiff, including falsely arresting, assaulting, and battering the plaintiff.

144.   The City of New York is therefore vicariously liable under New York State law for the aforesaid torts.

**WHEREFORE,** plaintiff demand a jury trial and the following relief jointly and severally against the defendants:

a.   Compensatory damages in an amount to be determined by a jury;

b.   Punitive damages in an amount to be determined by a jury;

c.   Costs, interest and attorney's fees, pursuant to 42 U.S.C. § 1988; and

d.   Such other and further relief as this Court may deem just and proper, including injunctive and declaratory relief.

DATED:   New York, New York
         February 27, 2012

MICHAEL O. HUESTON, ESQ.
*Attorney for Plaintiff*
350 Fifth Avenue, Suite 4810
New York, New York 10118
(212) 643-2900
mhueston@nyc.rr.com
By:

___s/_____
MICHAEL O. HUESTON